### NEWCOMBE vs. SKIPWITH.

*By the Court,* MARTIN, *J. alone.* This is an action on which process of attachment has been sued out and levied on a negro woman, the property of the defendant, who is stated to be a resident of the village of Montesano, near Baton Rouge, under the 11th section of the act of 1805, ch. 25, which authorises the issuing of that process, " for the recovery of a debt due from a person residing out of the territory." The defendant alleging that Montesano is within this territory, has prayed that the process of attachment may be set aside.

*Montesano is within the territory of Orleans.*

IT is admitted by both parties that this village lies within that tract of country, of which the Governor of this territory has lately taken possession, under the proclamation of the President of the United States of the 27th of October last, and which was hitherto known under the name of West-Florida.

THE plaintiff's counsel has resisted the motion of the defendant's, on the ground that this proclamation and the proceedings of the Governor under it, were acts wholly unauthorised by law, and therefore have wrought no change in the national character of the people, nor impaired the right of the Spanish crown to the soil; further that, admitting that by these proceedings the right of the United States has ripened into a complete title by the possession, still the country could not by the proclamation be added to this territory, the boundaries of which are fixed by law, and can neither be enlarged or narrowed by the executive of the union.

HE has contended that, although the lands on the eastern bank of the Mississippi to the river Perdido were, before the peace of 1763, part of the *province* of Louisiana, they were at that time carved out and transferred to the British, who erected them into a distinct province, under the name of West-Florida, and that on the surrender of the British title to Spain, at the peace of 1783, although the provinces of Louisiana and West-Florida were placed under the administration of

one officer; yet they were still considered as distinct provinces—the administrator taking the title of Governor-General *de las provincias* (in the plural) *de la Louisiana y la Florida occidental*—that by the treaty of St. Ildefonso, Spain having parted with nothing but the colony or province of Louisiana, her title to that of West Florida is unimpaired; and the defendant must therefore be considered as residing within the Spanish dominions, and his property, in this territory, consequently liable to be taken hold of by process of attachment.

THE defendant's counsel has replied, that the province of Louisiana was ceded with the extent it had, at the cession, in the hands of Spain—and that it had when France possessed it—and such as it should be after the treaties subsequently entered into between Spain and other states:

THAT although the governor-general took the title mentioned by the plaintiff's counsel, yet the records of the country show that for certain purposes, the province of Louisiana, in the hands of Spain, extended to the eastern shore of the Mississippi. We frequently meet with papers entitled *Provincia de la Luisiana, Distrito de Natchez, Provincia de la Luisiana, Distrito de la Mobile.*

THAT France occupied the country on both sides of the river from the year 1698, when she began her establishments at Biloxi, under the name of Louisiana, till the 3d of November 1762, when by a secret treaty the island on which

U

FALL, 1810.
First District.

NEWCOMBE
vs.
SKIPWITH.

stands the city of New-Orleans and her posses-
sions on the western banks of the Mississippi,
were ceded to Spain. It is true, almost seven
years elapsed before the Spanish troops took ac-
tual possession of the country, but during that in-
terval, since the court of France put no obstacle
to the possession of the country, it must be intend-
ed between France and Spain, the possession of
the former was the possession of the latter. On
the same day, that the secret treaty transferred
the western bank to Spain, were signed the pre-
liminary articles by which the eastern was trans-
ferred to Great Britain, and the definitive treaty
was signed on the 10th of February following—
so that the title of France to all her possessions
on the Mississippi, to the whole province of Loui-
siana, was transferred on the same day: The
words *when France possessed it*, (the province of
Louisiana) must refer to her possession anterior
to the transfer, and cannot be satisfied, if the
eastern bank of the Mississippi, on which Mon-
tesano stands, be excluded.

LASTLY, the province is transferred " as it
" should be after the treaties subsequently enter-
" ed into between Spain and other states." From
the year 1763 till the peace of 1783, the pro-
vince of Louisiana was confined to the island on
which the city of New-Orleans stands, on the
eastern bank of the Mississippi. In that year
took place the only treaty *between Spain and other
states*, which may have wrought any change—
after it, the eastern bank fell again under the ad-

ministration of the Spanish officer who governed Louisiana, and may perhaps, though not strictly, be said to be part of Louisiana: but these latter expressions have no meaning unless they are intended to attach West Florida to Louisiana in the cession, in the same manner it was in the administration of government.

AND the counsel has concluded, that as West-Florida was ceded, and ceded as part of the colony or province of Louisiana, it follows under the act of congress that it is part of this territory.

THE right of the United States to the country latety occupied by them, appears to me improperly brought before the court. *Non nostrum.... tantas componere lites.* When a sovereign takes possession of a tract of country, respecting which the claim of a foreign power comes in collision with his own, his courts of justice cannot inquire into the validity of his title. It suffices for them that the new territory has been *de facto* annexed to the general domain. Whether the annexation violates the rights of another power is a *political*, not a legal question. In vain would they inquire into a case in which they could apply no remedy. If they considered the occupation of the ground as an illegal act, they could not order the sovereign's force to retire; if they judged it legal, they could not aid him in maintaining his possession. The country once in his power must be governed by his laws; and his judges must yield their aid in carrying them into execution.

BUT it is not enough for the defendant to have shown that the place of his residence is within the dominions of the United States ; in order that he should have the benefit of his motion, he must show that it is within the territory of Orleans.

THE boundaries of that territory are established by an act of Congress, 7 *Laws U. S.* 112. On the eastern side of the Mississippi they include all that portion of country ceded by France to the United States, under the name of Louisinna, which lies south of the Mississippi territory.

ALL the lands ceded by France to the United States, are described in the treaty of cession by the appellation of Louisiana.

THE Congress must have considered West-Florida as part of the ceded territory, otherwise they would not have referred to the Mississippi territory as the country to the north of it. They would have given to the territory of Orleans a natural boundary, the bayou Manshac, which would have bounded it on the north-east, if West-Florida were not to make a part of it.

IN this act the intention of the legislature of the union to consider West-Florida as part of this territory is very strongly implied, and it most pointedly appears in another, that they viewed it as part of their dominions. 7 *Laws U. S.* 34. The President is authorised to erect the shores of the bay and river Mobile, &c. and west thereof to the Pascagoula, a separate district for the collection of customs.

IT follows that by *the law of the land*, by a treaty constitutionally made, according to the construction and interpretation of Congress, West-Florida has become the domain of the United States, and has been, by the act establishing this territory, included within the limits of it.

CONGRESS are the legitimate interpreters of treaties. To their interpretation every citizen is obliged to submit. They have the power to repeal them; for they may declare war, and a declaration of war is a repeal of a treaty of peace, which generally begins: *There shall be a firm, inviolable and universal peace, and a true and sincere friendship between, &c.* They may declare a treaty no longer obligatory, as in the case of the treaties with France, in 1798, 4 *Laws U. S.* 162, *chap.* 84. The power of repealing must include that of interpreting, *omne majus includit in se minus.* To the interpretation of the legislature, the President of the United States was bound to conform; he could adopt no other rule; and the law of the land having made West-Florida part of this territory, he was bound to see that it should be thereto annexed, if it could be done, without waging war against a nation with whom the United States were at peace. His proclamation was therefore legal: so were the proceedings of the governor under it.

IT is true, that till lately the officers of the territory, and till now its supreme judicial magistrates, have exercised no jurisdiction beyond the

FALL, 1810.
First District.

NEWCOMBE
*vs.*
SKIPWITH.

FALL, 1810.
First District.

bayou Manchac. An impediment existing thereto, to wit : the possession of the country by the armed force of Spain. *Inter arma silent leges.* The impediment is now generally removed, and exists only in a small corner: and the United States are now *de facto* in possession; their flag is displayed in it. The chief executive magistrate of the territory, and his officers, as well as the inferior judicial magistrates, exercise peacefully their respective powers. This court cannot refuse to recognise the inhabitants as intitled to the protection of, and subject to the laws of the territory.

*Ellery* for the plaintiff.
*Alexander* for the defendant.